**Jon C. BUNN, Plaintiff-Appellant,**

v.

**GLOBAL MARINE, INC., Defendant-Appellee.**

**No. 29002.**

United States Court of Appeals,
Fifth Circuit.

June 18, 1970.

John Cash Smith, Wayne Peveto, Orange, Tex., for appellant.

Edward W. Watson, Galveston, Tex., for appellee.

Before BELL, COLEMAN and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge.

This appeal concerns the construction of a contract made for the services of a cook on an oceanographic research vessel, the Glomar Challenger. That a contract enforceable by the cook was made is no longer questioned. The parties here dispute the term of service for which they contracted. The District Court, steering a middle course through the waters of contention, determined that the term of service was for one voyage of the Glomar Challenger. In assessing the damages to be awarded the cook, the District Court determined further that the statutory liquidated-damages provision applicable to certain improperly discharged seamen, 46 U.S.C. § 594, was inapplicable to the cook. We conclude that the contract of employment was for two voyages rather than one. We also conclude, for reasons different from those stated by the District Court, that section 594 does not limit the amount of damages due the cook to one month's wages. Accordingly, we reverse the judgment and remand the case for a computation of the damages award to be made in light of this opinion.

Jon C. Bunn, the appellant here, brought this action to recover the damages he sustained as a result of Global Marine, Inc.'s breach of an employment contract it had made with Bunn. The parties had contracted for Bunn's services as First Cook aboard the Glomar Challenger, an ocean-going vessel owned and to be operated by Global Marine. Their contract was made as follows. On May 28, 1968, while the Glomar Challenger was still under construction at Orange, Texas, Global Marine's personnel manager sent Bunn a letter offering him the position of First Cook on the Glomar Challenger.[1] Enclosed with this

---

1. The letter reads as follows:

"[1] It is my privilege to inform you that you have been selected to serve aboard the GLOMAR CHALLENGER on the first leg of its initial period of operation while under contract to Scripps Institution of Oceanography. I am sure you feel, as I do, that this will be a gratifying experience to become involved in such an ambitious exploratory program as the Deep Sea Drilling Project will prove to be. This leg will start at Orange, Texas on about July 1, 1968 and terminate in New York approximately 60 days later. You will report to the GLOMAR CHALLENGER at Orange, Texas. Your transportation from your home to Orange, Texas will be arranged by Global Marine Personnel Department.

"[2]  *  *  *

"[3] You will be relieved in New York approximately September 1 by another crew who will operate the CHALLENGER for the second leg of the Atlantic operation. At this time Global Marine will arrange for your transportation to your home for approximately 60 days or until the CHALLENGER is due into its terminal of its second leg which is Dakar, Senegal, West Africa.

"[4] You will be notified approximately November 1 as to transporta-

tion arrangements and the time to report to Houston, the only staging area of the CHALLENGER on the third leg of its Atlantic operation. This time you will work through the South Atlantic to Rio de Janeiro arriving in Rio approximately January 1.

"[5] I would like to remind you of the weather conditions you will encounter on your first trip.  *  *  *

"[6]  *  *  *

"[7]  *  *  *

"[8] On the initial trip of the GLOMAR CHALLENGER, it will be cleared from one U. S. port to another U. S. port. Under these conditions, U. S. Customs will not permit us to carry bonded sea stores, that is, tax free cigarettes, for this voyage. Tax free cigarettes will be available for all other trips, but you may prefer to bring your own on this first trip, although we will have supplies aboard, unfortunately, the price will reflect the necessary taxes.

"[9]  *  *  *

"[10] Your successful completion of this 18 month initial period will make you eligible for a $100. a month bonus or $1800. This bonus will apply to any continuation of the Deep Sea Drilling Project on a monthly basis."

The numbers in brackets have been added for the convenience of the Court.

letter to Bunn was a form for Bunn's reply, which Bunn signed and returned to Global Marine on May 31, 1968.[2]

On or about June 3, 1968, Bunn entered Global Marine's employ while the Glomar Challenger was being completed at the Orange Shipyard. He helped set up the vessel's galley and served as First Cook on the vessel's sea trials. On July 12, 1968, before the Glomar Challenger departed on the first "leg" or voyage of its initial period of operation, as described in Global Marine's letter to Bunn, Bunn was informed that his services would no longer be required. He was then paid through July 15, 1968, and was released as of that date.

Bunn never signed formal ship's articles with Global Marine, and the only agreement for his employment as First Cook aboard the Glomar Challenger was in the exchange of the two letters set out above. The cook performed his duties for Global Marine satisfactorily and was discharged without his consent and without fault on his part.

Bunn contends that he was employed for the full period of eighteen months described in paragraph 10 of Global Marine's letter. He argues that he was meant to work the first "leg" of sixty days and alternate legs thereafter, as set forth in defendant's letter, and was entitled to his loss of earnings over the entire period, including the $1,800 bonus. Global Marine contends that, if there was any contract of employment, it covered only the first "leg" of sixty days;

alternatively, if the contract covers any later "leg" or voyage, it would no longer be for a coastwise voyage only, and Bunn's damages would be limited to one month's wages under 46 U.S.C. § 594.

After a trial to the court, the District Judge concluded as a matter of law that (1) Global Marine's letter and Bunn's reply constituted a contract of employment, (2) this contract was only for the first "leg" of the vessel's operations, (3) since this "leg" was only a coastwise voyage, section 594 did not apply, and (4) Bunn was entitled to damages amounting to the difference between what he would have earned aboard the Glomar Challenger and what he did earn in other employment during the sixty-day period of the first "leg."

## I.

We first consider Bunn's contention that the District Court erred in concluding that the term of service for which the parties contracted was the first sixty-day "leg" or voyage of the Glomar Challenger. Global Marine's letter of May 28 and Bunn's reply of May 31 comprise the employment contract. From the contract language it is possible to conclude that the term of Bunn's employment was for any one of the following: the first "leg" of the vessel's "initial period of operations"; the first and third "legs"; or as many alternating "legs" as were includable within the vessel's "18 month initial period." We must, of course, view the contract in its

2. The letter reads as follows:
"[1] I accept the position of First Cook offered to me aboard the GLOMAR CHALLENGER.
"[2] I understand that I will work 12 hours a day, 7 days a week during the duration of each trip and until I am relieved in port prior to being returned to my home.
"[3] I agree to accept the pay offered and understand that it is based on 40 hours straight time per week and 44 hours time and a half per week at a straight time rate of $3.24 per hour. These wages will be subject to U. S. income taxes. My transportation will be arranged by Global Marine at their

expense between my home and the ship and upon completion of the trip I will expect to be returned to my home by Global Marine Inc. at no expense to me. I understand also that I will be reimbursed for 12 hours per day while traveling to and from the GLOMAR CHALLENGER at the rate of $1.60 per hour straight time and lodging and meals will be arranged for by Global Marine Inc.
"[4] You are requested to report to the GLOMAR CHALLENGER in Orange, Texas. * * *"
The numbers in brackets have been added for the convenience of the Court.

entirety and consider all its provisions together in settling the meaning of the contract. So doing, we do not find that the contract is reasonably susceptible to the interpretation most urged by Bunn —that an eighteen-month period comprised his term of service. The contract is, however, reasonably susceptible to either of the other two possible meanings. It is, therefore, ambiguous, and we must apply rules of construction to resolve the ambiguity.

Paragraph 1 of the May 28 letter informs Bunn that he has been selected to serve aboard the Glomar Challenger "on the first leg of its initial period of operation." This paragraph further states that the first "leg" would start at Orange, Texas, and end, about sixty days later, at New York City. There, Bunn would be relieved by another crew that would operate the vessel on its second "leg" en route to Dakar, Senegal, and Global Marine would arrange for Bunn's transportation back to Orange "for approximately 60 days or until the CHALLENGER is due into * * * Dakar." (Paragraph 3.) Paragraph 4 states that Bunn would be "notified approximately November 1 [when the second "leg" should have ended] as to transportation arrangements and the time to report to Houston," the staging area of the Glomar Challenger of the third "leg" of its initial operation. "This time," Bunn was told, "you will work through the South Atlantic to Rio de Janeiro arriving in Rio approximately January 1." In paragraph 5 Global Marine informs Bunn, "I would like to remind you of the weather conditions you will encounter on your first trip." Paragraph 8 advises that the vessel will not be allowed to carry tax-free cigarettes on the first "leg" and advises, "Tax free cigarettes will be available for all other trips, but you may prefer to bring your own on this first trip * * *." Finally, the letter states that Bunn will be eligible for a bonus upon his successful completion of the "18 month initial period" of the Glomar Challenger's operations. Bunn's acceptance letter, prepared by Global Marine, states in part that Bunn accepts the position of First Cook aboard the Glomar Challenger (paragraph 1) and that he "understands that [he] will work 12 hours a day, 7 days a week during the duration of each trip and until relieved in port prior to being returned to [his] home." (Paragraph 2.)

■ On the undisputed facts contained in the record, we must settle the meaning of these provisions to resolve the ambiguity regarding the term of service for which the parties contracted. Resolving doubts against the party who prepared the writings, Global Marine, we hold that this maritime contract contemplated Bunn's services aboard the Glomar Challenger on the first and third "legs" of its initial period of operation. Global Marine's offer deals with both "legs" in specific terms, and the most reasonable construction of this offer is that employment on both was tendered. Bunn's reply supports this construction, since it refers to the matter of transportation and expenses respecting "each trip." We cannot accept Global Marine's argument that its references to other than the first "leg" were merely bait meant to lure Bunn into accepting employment for the first "leg" only. Global Marine promised to employ Bunn for two "legs" and we hold it to that promise.

II.

■ We next consider whether 46 U. S.C. § 594 provides the sole remedy available to Bunn for Global Marine's breach of contract. Section 594 reads:

"Any seaman who has signed an agreement and is afterward discharged before the commencement of the voyage or before one month's wages are earned, without fault on his part justifying such discharge, and without his consent, shall be entitled to receive from the master or owner, in addition to any wages he may have earned, a sum equal in amount to one month's wages as compensation, and

may, on adducing evidence satisfactory to the court hearing the case, of having been improperly discharged, recover such compensation as if it were wages duly earned."

This section is one of a number of federal statutes designed to give seamen, the "wards of the admiralty," unusual rights and remedies with respect to wages. See 4 Benedict, The Law of American Admiralty § 621 (Knauth 6th ed. 1940); 1 Norris, The Law of Seamen § 367 (3d ed. 1970). In essence, the section is meant to afford the seaman a simple, summary method of establishing and enforcing damages for the breach of his contract of employment. United States Steel Products Co. v. Adams [The Steel Trader], 275 U.S. 388, 390, 48 S.Ct. 162, 163, 72 L.Ed. 326 (1928).

The District Court determined that section 594 was inapplicable to this case under its view that the contract covered only the first "leg" of the vessel's operation, a coastwise voyage. Since section 594 does not apply to vessels engaged in the coastwise trade, 46 U.S.C. § 544,[3] unless shipping agreements are signed as provided for in 46 U.S.C. § 563,[4] the District Court concluded that section 594 did not limit Bunn's damages to one month's wages under his contract.

Disagreeing with the District Court, we have concluded that the contract covered the first and third "legs" of the vessel's initial period of operation. Since the third "leg" involves a voyage to Brazil, the Glomar Challenger was not, insofar as Bunn is concerned, a vessel solely engaged in the coastwise trade. Consequently, Bunn must look elsewhere than to the coastwise trade exception, 46 U.S.C. § 544, for relief from the one month's wages limitation that section 594 imposes upon the amount a seaman is entitled to recover under that section for an improper discharge.

3. This section reads:
   " § 544. Vessels in coastwise trade
   "None of the provisions of sections 201–203, 542a, 543, 545, 546, 561, 562, 564–571, 574, 577, 578, 591–596, 600, 621–628, 641–643, 644, 645, 651, 652, 662–669, 701–709, 711, 713 of this title shall apply to sail or steam vessels engaged in the coastwise trade, except the coastwise trade between the Atlantic and Pacific coasts, or in the lake-going trade touching at foreign ports or otherwise, or in the trade between the United States and the British North American possessions, or in any case where the seamen are by custom or agreement entitled to participate in the profits or result of a cruise, or voyage."

4. This section reads:
   " § 563. Shipment of crews; shipping agreements
   "Coast Guard officials to whom the duties of shipping commissioners have been delegated may ship crews for any vessel engaged in the coastwise trade, or the trade between the United States and the Dominion of Canada, or Newfoundland, or the West Indies, or the Republic of Mexico, at the request of the master or owner of such vessel.
   "When a crew is shipped by such Coast Guard official for any American vessel in the coastwise trade, or the trade between the United States and the Dominion of Canada, or Newfoundland, or the West Indies, or Mexico, as authorized by this section, an agreement shall be made with each seaman engaged as one of such crew in the same manner as is provided by sections 564 and 565 of this title, not however including the sixth and eighth items of section 564 of this title, and such agreement shall be posted as provided in section 577 of this title, and such seaman shall be discharged and receive their wages as provided by the first clause of section 596 of this title, and also by sections 593–595, 597, 600, 603, 604, 625–628, 641–643, 644, 645 and 651 of this title; but in all other respects such shipment of seamen and such shipping agreement shall be regarded as if both shipment and agreement had been entered into between the master of a vessel and a seaman without going before such Coast Guard official: *Provided*, That the clothing of any seaman shall be exempt from attachment, and that any person who shall detain such clothing when demanded by the owner shall be deemed guilty of a misdemeanor, and shall be imprisoned not more than six months or fined not more than $500, or both."

■ We note, first, the points that are not in dispute. Bunn, employed to serve as a cook aboard the Glomar Challenger, is a "seaman" for the purposes of this case. 46 U.S.C. § 713; *see, e. g.,* Haycraft v. The Java Sea, W.D.Ky., 1956, 143 F.Supp. 303; The James H. Shrigley, N.D.N.Y., 1892, 50 F. 287. Although he had been employed for more than a month on shore and during sea trials, Bunn was discharged, without his consent or fault on his part to justify this action, before the vessel commenced the first "leg" of its initial period of operation.[5]

■ Bunn contends that section 594 is inapplicable to his claim for breach of contract because the "agreements" to which this section refers are "shipping articles" rather than contracts such as his. The term "agreement," as it appears in section 594, has not been defined by statute, and we apparently are the first court to consider whether "agreement" means only "shipping articles." Since section 594 is a remedial statute, The Steel Trader, 275 U.S. 388, 48 S.Ct. 162, 72 L.Ed. 326 (1928); Calvin v. Huntley, 178 Mass. 29, 59 N.E.

435 (1901), we construe the term broadly and flexibly to effectuate the statute's purposes. *See* Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). Our inquiry, consequently, is directed to the question whether the purposes of section 594 will be advanced by application of the section to the contract in issue here.

■ Under the federal scheme for regulating the relations of the seaman with his master and the shipowner, the shipping article is the basic contract of employment between the master and the seaman. The Seatrain New Orleans, 5 Cir., 1942, 127 F.2d 878; 1 Norris, The Law of Seamen § 88 (3d ed. 1970). Federal law requires that the master of every vessel bound from a port in the United States on a voyage to any foreign port make a written or printed "agreement" with every seaman whom he carries to sea as one of the crew. Excepted from this requirement are voyages between the United States and British North American possessions, the West Indies, or Mexico, and also vessels of less than 75 tons engaged in the intercoastal trade. 46 U.S.C. § 564.[6] Ev-

---

5. It might be argued that section 594 by its terms does not apply to this case because Bunn was paid for a month's work on shore and during sea trials. This argument requires, however, that the "phrase before the commencement of the voyage or" be read out of the statute. This we decline to do. The Steel Trader, 275 U.S. 388, 48 S.Ct. 162, 72 L.Ed. 326 (1928); Bagley v. United States, N.D.Cal., 1948, 77 F.Supp. 260.

6. This section reads:
    " § 564. Shipping articles
    "The master of every vessel bound from a port in the United States to any foreign port other than vessels engaged in trade between the United States and the British North American possessions, or the West India Islands, or Mexico, or of any vessel of the burden of seventy-five tons or upward, bound from a port on the Atlantic to a port on the Pacific, or vice versa, shall, before he proceeds on such voyage, make an agreement, in writing or in print, with every seaman whom he carries to sea as one of the crew, in

the manner hereinafter mentioned; and every such agreement shall be, as near as may be, in the form given in the table marked A, in the schedule annexed to this chapter, and shall be dated at the time of the first signature thereof, and shall be signed by the master before any seaman signs the same, and shall contain the following particulars:
    "First. The nature and, as far as practicable, the duration of the intended voyage or engagement, and the port or country at which the voyage is to terminate.
    "Second. The number and description of the crew, specifying their respective employments.
    "Third. The time at which each seaman is to be on board, to begin work.
    "Fourth. The capacity in which each seaman is to serve.
    "Fifth. The amount of wages which each seaman is to receive.
    "Sixth. A scale of the provisions which are to be furnished to each seaman.

ery such "agreement" shall be, as near as may be, in the form entitled "Articles of Agreement" which is set out in 46 U.S.C. § 713.[7] Vessels engaged in the coasting trade, with certain exceptions, require written "agreements," signed by master and seamen, giving the voyage or "term of time" for which the seamen are shipped. 46 U.S.C. § 574.[8] Vessels engaged in the coastwise trade, as distinct from the coasting trade, do not, with certain exceptions, require the written or printed "agreements" prescribed for vessels in the foreign or coasting trades, 46 U.S.C. § 544, but the section 713 form applicable to vessels in the foreign trade, with certain modifications, will be required for the shipment of crews on vessels in the coastwise trade at the request of master or owner. 46 U.S.C. § 563.

■ Construing section 594 in light of the statutes requiring or providing for written or printed "agreements" between master and seamen, we conclude that Congress, when it employed the term "agreement" in section 594, had in mind the type of agreements specified in other sections of the federal shipping laws—that is, shipping articles of agreement signed by the seaman and the master of the vessel on which he is shipped.[9] We do not say that only seamen who have signed formal articles in the manner prescribed by statute were meant to have the remedy provided by section 594 for improper discharge. Rather, we believe that the determination in cases such as this of whether the writing signed by the seaman is an "agreement" within the meaning of section 594 depends upon whether the writing is the sort of contract for employment for which the section was meant to provide the seaman his remedy upon his improper discharge by the owner or master.

■ As indicated, section 594 was designed to provide the seaman with a simple, summary method of establishing and enforcing damages upon his improper discharge. This is a remedial statute enacted for the protection of the "wards of the admiralty." In the usual case involving statutory shipping articles, application of section 594 produces a reasonable result beneficial to the seaman. The seaman is protected from the possible indefiniteness of the articles to the

---

"Seventh. Any regulations as to conduct on board, and as to fines, short allowance of provisions, or other lawful punishments for misconduct. which may be sanctioned by Congress or authorized by the Commandant of the Coast Guard not contrary to or not otherwise provided for by law, which the parties agree to adopt.
"Eighth. Any stipulations in reference to advance and allotment of wages, or other matters not contrary to law."

7. Table A in this section, entitled "Form of Articles of Agreement," contains the prescribed form.

8. This section reads:
" § 574. Shipping articles for vessels in coasting trade
"Every master of any vessel of the burden of fifty tons or upward, bound from a port in one State to a port in any other than an adjoining State, except vessels of the burden of seventy-five tons or upward, bound from a port on the Atlantic to a port on the Pacific, or vice versa, shall, be-

fore he proceeds on such voyage, make an agreement in writing or in print, with every seaman on board such vessel except such as shall be apprentice or servant to himself or owners, declaring the voyage or term of time for which such seaman shall be shipped."

9. That sections 564, 574, 594 and 713 were all parts of the Shipping Commissioner's Act of 1872 provides support for our view. The Shipping Commissioner's Act was substantially the British Merchant Shipping Act of 1854, "with such changes as have been deemed necessary to adapt it to this country." Cong. Globe, March 20, 1872, at 136 (remarks of Rep. Conger). Section 594 corresponded to section 167 of the Shipping Act of 1854. As construed, section 167 meant that when a seaman is improperly discharged, "he is to have due compensation up to a month's wages in lieu of his right of action, unless he has earned a month's wages, in which case the section does not apply." Tindle v. Davison, 66 L.T.R. (n.s.) 372, 374 (Q.B. 1892).

extent that he is assured of obtaining, in addition to the wages he has actually earned, an amount equal to one month's wages; he has a simple method available for collecting his damages; and he is not limited to an action against the owner or master, but can proceed against the vessel in an action in rem.[10]

■ In this case, we conclude that section 594 does not apply to Bunn's contract. Bunn did not hire on in the usual course, but instead signed a privately negotiated contract made exclusively with reference to him. This contract covered his services for two voyages, not one, as in the usual shipping article. Application of section 594 to limit the damages Bunn may recover for breach of this multivoyage contract would produce an unreasonable result, and we believe that a remedial statute should not be so construed and applied that it works to the substantial detriment of persons in the class it was designed to protect.

The Supreme Court's decision in The Steel Trader, 275 U.S. 388, 48 S.Ct. 162, 72 L.Ed. 326 (1928), is not apposite. In that case, a seaman had signed articles for services aboard the vessel during a voyage from New Orleans to East Indian ports and return. He was discharged after the commencement of the voyage, but before he had earned one month's wages. When the vessel returned to New Orleans he brought an in rem action to recover the wages he would have earned for the entire voyage had he not been improperly discharged. In reversing the seaman's judgment for this amount, the Supreme Court stated:

" * * * According to the plain language employed, [section 594] applies where the discharge takes place before the commencement of the voyage or before one month's wages are earned. Also we think, in the specified circumstances, payment of wages actually earned, with an additional sum equal to one month's wages, satisfies all liability for breach of the contract of employment by wrongful discharge. * * * "

275 U.S. at 390, 48 S.Ct. at 163. This reading of section 594 is relevant, of course, only to actions for breaches of "agreements" within the ambit of the section. The Steel Trader dealt with the usual variety of seaman's shipping articles. Here, on the other hand, we are concerned not with shipping articles but with a separately negotiated contract. This distinction is determinative under the circumstances presented.

To conclude, we hold that Bunn's contract with Global Marine was for the first and third "legs" of the Glomar Challenger's initial period of operations and that section 594 is inapplicable to fix the damages Bunn may recover for breach of this contract.

Reversed and remanded.

---

10. Under the American law of admiralty, the existence of a maritime lien is synonymous with the availability of a libel in rem. The Rock Island Bridge, 73 U.S. (6 Wall.) 213, 215, 18 L.Ed. 753, 754–755 (1867); Gilmore & Black, The Law of Admiralty § 9–19, at 510 (1957). The rule in admiralty is well settled that no lien attaches for the breach of an executory contract. Liability attaches in admiralty, as elsewhere, for the breach of a valid contract, but until the parties have entered into performance, the remedy in admiralty for the breach is in personam only. Gilmore & Black, supra, § 9–22. Since a maritime lien is the foundation of a proceeding in rem, and since the seaman does not have a claim against the vessel for the wages he would have earned had he not been improperly discharged, the seaman, absent the protection afforded him by section 594, can proceed only against the owner or master of the vessel for the wages he would have earned and may not use the summary in rem procedures Congress has provided seamen for the collection of their earned wages, e. g., 46 U.S.C. § 604. See The Golden Kauri, E.D.La., 1939, 28 F.Supp. 288, 290. Section 594 not only entitles the seaman to one month's wages in addition to the wages he earned before discharge, but also allows him to maintain an in rem action and employ the statutory provisions provided to seamen for the collection of earned wages. This is the significance of the phrase "recover such compensation as if it were wages duly earned." 46 U.S.C. § 594.