Emmett E. NEATHERY, Appellant,

v.

M/V OVERSEAS MARILYN and Maritime Overseas Corporation, Appellees.

No. 82–1147.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 4, 1982.

Decided Feb. 10, 1983.

Ralph Rabinowitz, Norfolk, Va. (Rabinowitz, Rafal & Swartz, P.C., Norfolk, Va., on brief), for appellant.

Michael F. Leban, Norfolk, Va. (Michael T. Zugelder, Newport News, Va., Seawell, Dalton, Hughes & Timms, Norfolk, Va., on brief), for appellees.

Before SPROUSE and ERVIN, Circuit Judges and BLACK *, District Judge.

ERVIN, Circuit Judge:

This case involves the attempt by a seaman, Emmett E. Neathery, to recover unpaid wages. By a comedy of errors, Neathery was left behind when the M/V OVERSEAS MARILYN, a vessel owned by Maritime Overseas Corporation ("Shipowner") on which he had contracted to serve, sailed for the Netherlands. Neathery appeals the district court's decision denying his claims for relief. Because the district court misread the applicable federal statute in reaching its decision, we reverse.

### I.

On March 10, 1981, Neathery signed shipping articles (an employment contract) through his union hall with Shipowner's agents to serve aboard the OVERSEAS MARILYN on a voyage from Norfolk to the Netherlands. The labor-management agreement governing Neathery's employment stipulated that the vessel's sailing time be posted at least eight hours prior to sailing, or no later than 5 p.m. if scheduled between midnight and 8 a.m.

On March 11, Neathery stood watch on the OVERSEAS MARILYN from 8 a.m. to 4 p.m., and then left to visit his family in Portsmouth. When Neathery finished his watch, the sailing board on which the sailing time was posted stated that the vessel would sail from its then location at the Norfolk & Western Coal Pier at 8 p.m. that evening. Neathery therefore returned to the OVERSEAS MARILYN at 7 p.m., at which time he discovered that the sailing board had been changed to state that the vessel would shift to the Newport News Pier No. 15 at 10:30 p.m. and depart from there at 3 a.m. on March 12. Uncontradicted evidence indicated that this change was made after 5 p.m., in violation of the labor-management agreement.

After stowing his gear, including his Coast Guard seaman's papers and his union documents, aboard ship, Neathery returned home. While he was at home, Shipowner's agents changed the sailing board once more, again in violation of the labor-management agreement, to indicate that the OVERSEAS MARILYN would bypass Newport News and instead shift to offshore anchorage at midnight. As a result of the second change, when Neathery arrived at Pier No. 15 at Newport News sometime after 1 a.m., the vessel was not there. The pier manager informed Neathery that the vessel's move to Pier No. 15 had been cancelled. On Neathery's request, the pier manager telephoned the Virginia State Pilots' office and was informed erroneously that the OVERSEAS MARILYN already had sailed for the Netherlands. Neathery then returned home and from there called the vessel's tug company, which informed him correctly that the OVERSEAS MARILYN had undocked from the Norfolk & Western pier. Neathery did not call Shipowner's agents, or make any further attempts to locate the vessel.

In the meantime, Shipowner's agents had hired a taxi company to pick up from Pier No. 15 crew members who had not learned of the second sailing board change. Two cabs were at the Newport News pier area from about 2 a.m. until 3:20 a.m. One crew member was transported by cab to a launch company which Shipowner's agents had hired to carry crew members to the vessel's anchorage. The taxi company's bill stated, however, that the cabs waited at Pier No. 14 rather than No. 15. Neathery's undisputed testimony was that a large coal chute

* Honorable Walter E. Black, Jr., United States District Judge for the District of Maryland, sitting by designation.

between the two piers hampered his view of No. 14, and that the parking lot at No. 14 was on its far side from No. 15. At trial, the district judge indicated that he accepted Neathery's statement that he saw no cabs.

On May 4, Neathery filed a complaint seeking lost wages, and advancing two bases for recovery, 46 U.S.C. § 594 (1958),[1] and general maritime employment contract principles. The district court found that Neathery and Shipowner were equally at fault, and held that Neathery's negligence barred recovery under § 594. The court also held that § 594 was Neathery's exclusive remedy.

## II.

■■■ In *U.S. Steel Products Co. v. Adams (The Steel Trader),* 275 U.S. 388, 390, 48 S.Ct. 162, 163, 72 L.Ed. 320 (1928), the Supreme Court stated that the purpose of § 594 is "to afford seamen a simple, summary method of establishing and enforcing damages" in the specified circumstances. The section is in effect a liquidated damages clause included by operation of law in all shipping articles. *See Newton v. Gulf Oil Corp.,* 180 F.2d 491, 494 (3d Cir.1950), *cert. denied,* 340 U.S. 814, 71 S.Ct. 42, 95 L.Ed. 598 (1950). Where § 594 applies, payment of the amount it specifies (earned wages plus a sum equal to one month's wages) completely satisfies the shipowner's liability for breach of the seaman's employment contract. *The Steel Trader,* 275 U.S. at 390, 48 S.Ct. at 163. Because § 594 fixes the amount a seaman may recover in the specified circumstances, he is under no duty to mitigate damages. *Lunquist v. S.S. Seatrain Maryland,* 359 F.Supp. 663, 665 (D.Md. 1973).

■■■ In *Vlavianos v. The Cypress,* 171 F.2d 435, 439 (4th Cir.1948), *cert. denied,* 337 U.S. 924, 69 S.Ct. 1171, 93 L.Ed. 1732

(1949), this court noted that § 594 should be "liberally construed in accordance with its remedial purpose." Thus, once it is established that a seaman satisfies the conditions set forth in § 594, he is entitled to receive as damages the statutory amount even if this in effect provides him with a windfall. In *Newton,* for example, the plaintiffs signed shipping articles to serve on a voyage to Venezuela to last no more than three months. In fact, the vessel went on only a two-week voyage to Texas. The defendant shipowner proved that if the vessel had followed its announced itinerary, the voyage would have taken only one additional day. The court of appeals acknowledged with considerable understatement that the seamen "probably could not show, in an ordinary action of contract, damages which amounted to as much as a month's pay." 180 F.2d at 494. Nevertheless, it held that because the shipowner had committed a technical breach of contract, the seamen were entitled to the damages "liquidated by legislative enactment," i.e., their earned wages plus an additional month's wages. *Id.*

■■■ An aggrieved seaman must satisfy three conditions in order to be entitled to § 594 relief. The statute requires that:

(1) he sign an agreement to make the voyage;

(2) he be discharged either before the commencement of the voyage or before earning a month's wages; and

(3) his discharge be "without fault on his part justifying such discharge, and without his consent."

46 U.S.C. § 594.

Although the seaman must satisfy the court that he meets these conditions, the negligence or fault of the shipowner "can be used affirmatively to prove [the seaman's]

---

1. Section 594 states that:

Any seaman who has signed an agreement and is afterward discharged before the commencement of the voyage or before one month's wages are earned, without fault on his part justifying such discharge, and without his consent, shall be entitled to receive from the master or owner, in addition to any

wages he may have earned, a sum equal in amount to one month's wages as compensation, and may, on adducing evidence satisfactory to the court hearing the case, of having been improperly discharged, recover such compensation as if it were wages duly earned.

claim that he was 'improperly discharged' within the meaning of Section 594." *Fowles v. American Export Lines, Inc.,* 300 F.Supp. 1293, 1298 (S.D.N.Y.1969), *aff'd,* 449 F.2d 1269 (2d Cir.1971) (per curiam). The burden then passes to the shipowner to demonstrate an excuse for its seemingly incorrect behavior. *See Newman v. United Fruit Co.,* 141 F.2d 191, 193 (2d Cir.1944), *cert. denied,* 323 U.S. 711, 65 S.Ct. 73, 89 L.Ed. 572 (1944).

It is undisputed that Neathery satisfies the first two conditions of § 594. Both parties agree that Neathery signed shipping articles with Shipowner's agents and stood a day watch on the OVERSEAS MARILYN before being left behind. Neathery and Shipowner also agree that the vessel's departure *sans* Neathery constituted his discharge. *See Bibb v. Central Gulf Steamship Corp.,* 356 F.2d 919 (4th Cir.1966) (per curiam) (by implication) (seaman's culpable

failure to return to ship before sailing time constituted constructive and proper discharge).

The disputed and dispositive issue therefore is whether Neathery's discharge was "without fault on his part justifying such discharge." The district court's decision rests on its finding that he was at fault through negligence.[2] However, the district court apparently has misread the statute. The court opined that "[t]he express language of § 594 states that a seaman's discharge must occur without fault on his part." Slip op. at 5. This formulation of the requirement inadvertently excised the statutory language about "without fault on his part *justifying such discharge.*" The statute does *not* require that the seaman be blameless; rather, it insists only that his fault, if any, not be of a magnitude justifying his discharge.[3]

**2.** On appeal, Shipowner stresses that the district court found as a fact that Neathery failed to exercise due care in attempting to locate the OVERSEAS MARILYN. On this basis, Shipowner asserts that this court can review this key element of the trial court's decision only to determine whether it is "clearly erroneous." Fed.R.Civ.P. 52(a). This characterization of the issue on appeal is incorrect. In *Olah v. S.S. Jaladurga,* 343 F.2d 457, 458 (4th Cir.1965), this court acknowledged that the clearly erroneous standard is recognized in admiralty, but went on to state that when the reviewing court accepts "the subordinate [i.e., strictly factual] findings of the District Court ... [w]hether they manifest negligence ... is a question of law, for the factual foundation has been fully and finally settled and it is no longer further dependent upon a choice of factual inferences." *Id.* On questions of law, we apply our independent judgment.

The district court's finding of negligence was predicated on its acceptance of Neathery's testimony about his attempts to locate the OVERSEAS MARILYN. The district judge stated at the trial that he believed Neathery's statements about going to the Newport News pier, and his opinion cites without apparent incredulity Neathery's story about the phone calls to the State Pilots and to the tug company. The district court's conclusion is based neither on skepticism about Neathery's testimony, nor on a "selection of factual inferences which are reasonably deducible from the underlying facts," *Olah, id.* at 459, but on his legal judgment that Neathery's attempts to locate his vessel were so lackadaisical that they amounted to negligence equal to the undeniably incor-

rect behavior of the defendant. The court reached a second legal conclusion, that § 594 requires seamen recovering under it to be without fault. Before us, Neathery challenges that court's reading of the statute, not its findings of fact.

Shipowner also has attempted to cast doubt on the veracity of Neathery's testimony concerning his attempts to locate the OVERSEAS MARILYN. We do not find the district court's acceptance of Neathery's account clearly erroneous, and therefore must decline this invitation to overturn the court's factual findings.

**3.** The district court analyzed Neathery's § 594 claim as though it sounded in tort rather than in contract, and concluded that the doctrine of comparative negligence did not apply and therefore that Neathery's contributory negligence barred any recovery. The true issue for decision, whether Neathery had done anything which would justify Shipowner discharging him, was relegated to a footnote, in which the district court stated that its finding of fault on Neathery's part was consistent with precedent. Slip op. at 4 n. 1. The footnote cites three cases, all of which are readily distinguishable from the present case. In *Sellers v. United States Lines Co.,* 89 F.Supp. 254 (N.D.Cal. 1949), the court held that the seaman had been left behind due to his own carelessness; the testimony showed that he had been drinking and involved with a woman, and that the shore leave notice had been posted at 1:00 p.m. the day before departure. *Colon v. United States,* 74 F.Supp. 216 (S.D.N.Y.1947), involved a similar situation. The testimony showed that due

■ The "fault" attributed to Neathery is that he did not take sufficiently strenuous steps to correct the mishap. That mishap, however, was caused by Shipowner's breach of its duties under the labor-management agreement. Neathery obeyed in timely fashion the instructions posted on the sailing board at 4 p.m., and then again the new instructions he learned at 7 p.m. Upon discovering that the ship was not following the latter schedule, Neathery attempted to locate her by telephone. While it may be true that Neathery could have taken other, more effective measures to locate the OVERSEAS MARILYN, the record does not support a conclusion that his actions were inept to the point of justifying his constructive discharge.

The district court's finding of Neathery's fault was also based on the fact that Shipowner had hired a taxi company and a launch company to deliver to the OVERSEAS MARILYN seamen who were misled by the sailing board changes. The record does not support the conclusion that this effort cured Shipowner's breach of contract. The evidence indicates that the cabs waited at the wrong pier and that Neathery did not see them. Furthermore, although one crew member did manage to board the vessel using the cab and launch arrangement, the Shipowner failed to introduce evidence showing how that seaman located the cab. *See Newman,* 141 F.2d at 193 (in § 594 action, burden of proving shipowner's excuse for improper discharge lay on shipowner).

The district court's decision places the burden of averting the foreseeable effects of Shipowner's breach on Neathery, a member of the class for whose special benefit Congress enacted § 594. *See Bunn v. Global Marine, Inc.,* 428 F.2d 40, 45 (5th Cir. 1970) (§ 594 is one of a class of statutes intended to give seamen "unusual rights and remedies"). Such a reading of § 594 is opposed diametrically to this Court's instructions to construe the statute "liberally . . . in accordance with its remedial purpose." *Vlavianos,* 171 F.2d at 439. *See also Bunn,* 428 F.2d at 46.

### III.

Having denied Neathery's claim for relief under § 594, the district court considered and rejected his claim based on general maritime employment contract principles. Since we have determined that Neathery is entitled to recover under the statute, we need not reach this issue.

### IV.

Because we find that Neathery satisfied the affirmative conditions for recovery under § 594, and engaged in no conduct justifying his discharge by Shipowner, we hold that he is entitled to recover the statutory one month's wages plus any wages actually earned but unpaid. The decision of the district court therefore is reversed.

REVERSED.

to wartime conditions the sailing time was not posted but that ship's personnel about to go on shore leave were told in person to be back on board by midnight of the same day. All crew members who went ashore returned in time except the plaintiff, who failed to conclude a romantic interlude before the ship sailed. The court ruled that the plaintiff was at fault for his failure to sail with his vessel.

In *Santos v. Farrell Lines, Inc.,* 1974 A.M.C. 2359 (Civ.Ct.N.Y.1972), the plaintiff seaman had gone ashore in Monrovia, Liberia, on authorized shore leave at 6:45 p.m., December 24, 1971. The posted sailing time for his vessel was 2 p.m., December 26. At 7 p.m. on December 24, the posted time was changed to midnight of the same day. The ship's officers conducted a four-hour search of the city for seamen on shore leave and located all but two, one of whom was the plaintiff. Defendant later offered to return plaintiff to the ship, but he rejected the offer. The court dismissed the complaint, holding that the evidence did not warrant a finding of wrongful discharge, and that even if plaintiff had been wrongfully discharged, recovery was barred by his refusal to accept re-employment on the same vessel.