USCA1 Opinion

 

 ____________________ No. 96-1850 NAVIEROS INTER-AMERICANOS, S.A., Plaintiff, Appellee, v. M/V VASILIA EXPRESS et al., Defendants, Appellants, DUSAN JEFTIMIADES, Petitioner, Intervenor-Appellant. _________________________________ No. 96-1851 NAVIEROS INTER-AMERICANOS, S.A., Plaintiff, Appellee, v. M/V VASILIA EXPRESS et al., Defendants, Appellants, COASTAL SHIP REPAIR, INC., Petitioner, Intervenor-Appellant. _________________________________ No. 96-2174 NAVIEROS INTER-AMERICANOS, S.A., Plaintiff, Appellee, v. M/V VASILIA EXPRESS et al., Defendants, Appellants, MOTOR-SERVICES HUGO STAMP, INC., Petitioner, Intervenor-Appellant. _________________________________ No. 96-2175 NAVIEROS INTER-AMERICANOS, S.A., Plaintiff, Appellee, v. M/V VASILIA EXPRESS et al., Defendants, Appellants. _________________________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jose A. Fuste, U.S. District Judge] ____________________ Before Selya, Circuit Judge, Aldrich, Senior Circuit Judge, and Lynch, Circuit Judge. ____________________ Harry A. Ezratty for intervenor-appellant Dusan Jeftimiades. Francisco  G.  Bruno and Lilia  R.  Rodriguez  Ruiz, with whom McConnell  Valdes was on brief, for intervenor-appellant Coastal Ship Repair, Inc. Antonio M. Bird, Jr., with whom Bird Bird and Hestres was on brief, for intervenor-appellant Motor-Services Hugo Stamp, Inc. Stephen  T.  Perkins for defendant-appellants M/V VASILIA EXPRESS et al. Mark  C.  Landry, with whom Carlos  J.  Quilichini, Robert  A. Mathis, and Newman,  Mathis,  Brady,  Wakefield  &  Spedale were on brief, for appellee Gulf Coast Bank & Trust Co. ____________________ July 28, 1997 ____________________ LYNCH, Circuit Judge. This admiralty case features seven competing claimants, each trying to take from the proceeds of the sale of a seized vessel, the M/V VASILIA EXPRESS. Three claimants, in addition to the original charterer plaintiff, were allowed to intervene; all four won judgments after a three-day, expedited bench trial. Suit was originally brought in rem against the vessel. The vessel's corporate owner and its shipping agent both appeared, however, in  personam to defend the action, and were also held liable on two of the judgments (for the original charterer and another intervening charterer). The proceeds of the sale are insufficient to satisfy even these four successful claims. Various other claimants, whose claims would further tax the available funds, were not allowed to intervene. Three of these, the ship's captain and two repair companies, appeal. The owner of the vessel, the shipping agent, and the vessel itself also appeal together, arguing that the district court's entry of judgment against them is in error, and hence that there should be no division of proceeds at all. Alternatively, they argue that the two charterers were awarded excessive damages. These four appeals were consolidated. We affirm the judgment against the vessel and the two in personam defendants, but we vacate the damages awards to both charterers and remand for a reassessment of damages. We also affirm the denial of intervention to the captain, but we -2- 2 reverse the denials of the two repair companies' motions to intervene and remand to the district court to entertain those companies' proof, to calculate damages due them, if any, and to determine how the proceeds from the sale of the vessel should be allocated among the various judgment winners. I. The underlying facts are not now in dispute. On the morning of March 28, 1996, Navieros Interamericanos S.A., Inc. ("Navieros"), a Florida corporation, entered a fixed time charter party with the M/V VASILIA EXPRESS on a standard New York Produce Exchange form through a ship's broker, Jan Gisholt Shipping, Inc., also of Florida. According to the charter party, the M/V VASILIA EXPRESS was owned by Royal United Shipping, Inc. ("Royal United"), and was registered in the West Indies. During this litigation it was established that, despite this written representation, the vessel was actually  1. A "charter party" is "a specialized form of contract for the hire of an entire ship, specified by name." 2 Schoenbaum, Admiralty & Maritime Law S 11-1, at 169 (2d ed. 1994). A "time charter party," one of several different types of charter parties, is a contract "to use a ship in order to ship goods for a specific period of time." Id. S 11-5, at 178. Under such agreements, "[t]he carrier makes the ship's capacity available to the time charterer for this purpose. The charterer bears the expenses connected with each voyage and pays hire to the carrier based upon the time the ship is under charter." Id. A charter party is "fixed" when there is "a meeting of the minds, evidenced by the parties' communications, on the significant 'main terms' of a charter." Id. S 11-2, at 172. -3- 3 owned by Vasilia, Inc. ("Vasilia"), a corporation with close links to Royal United. Navieros chartered the vessel for two round-trips between Florida and Guatemala, with an option for a third round-trip, for a total engagement of about 27 days, at $2,300 per day. Navieros intended to ship, on behalf of various clients, "general merchandise, freight [of] all kinds, electrical material, toys, hardware, food stuffs, . . . heavy equipment, . . . road building construction-type machinery, and . . . used vehicles." The time charter party stated that delivery of the vessel to Navieros, the charterer, was to occur upon the vessel's arrival at the pilot station in Port Everglades, Florida, where Navieros's cargo was to be loaded. The charter party stated that this would happen "any time, day, night" after the fixing of the charter on March 28. At approximately 2:00 in the afternoon on March 28, Kenneth Coleman, the President of Navieros, boarded the vessel at dock in Miami, about 30 miles from Port Everglades. Coleman discussed the stowage plan with the captain, Dusan Jeftimiades, and with Michael Psarellis and instructed the captain to berth  2. Vasilia is a Liberian corporation with its principal place of business in Greece. Steven Psarellis, a Louisiana attorney, is described as the attorney-in-fact for the corporation. Royal United is a Delaware corporation. Vasilia Psarellis, Steven's mother (and the person after whom the vessel is named), is the president. Her other son, Michael, is the "principal operating manager." -4- 4 at Pier 19 when he arrived at Port Everglades, instead of at the pilot station. The next day, the M/V VASILIA EXPRESS left its berth in Miami, apparently headed for Port Everglades. The only deviation from the written agreement that Coleman had mentioned involved the berthing of the ship at a different point in Port Everglades, but the ship never reached Port Everglades. The vessel experienced problems with its bridge tachometer and stopped for repairs at Bicentennial Park, still inside the Port of Miami. Kenneth Coleman and his brother William, also a Navieros officer, visited the ship four or five times over the next week. During this time, Navieros also ordered fuel for the vessel, confirmed its reservation of the berth space at Port Everglades, and issued the necessary check in payment of United States customs dues. During this unexpected delay, Royal United, the putative owner of the vessel, entered into a second time charter party with Comet Lines Agency, Inc. ("Comet"), which was unaware of the charter party with Navieros. Royal United apparently believed at this time that the Navieros charter party had not yet been fixed. The Comet charter party, brokered by Americana Marine Services, began on April 4 and was  3. The record does not reveal the name of the company which made these repairs. We infer that it was Motor-Services Hugo Stamp, Inc., one of the two repair company appellants denied intervention in this case. -5- 5 to last for a period of 30 days. It brought a more lucrative charter rate, $2,630 per day, than did the Navieros charter. Comet intended primarily to carry cargo between San Juan, Puerto Rico and Venezuela. Since the vessel was in Miami at the start of the charter, Comet arranged to have some Venezuela-bound cargo brought down from Jacksonville and loaded there; Comet's intention was to have the vessel proceed to San Juan where more cargo would be loaded, and then to sail to Venezuela. Upon the vessel's arrival in the port of San Juan on April 13, however, the United States Coast Guard detained the vessel for a litany of safety violations and ordered it not to proceed to sea without Coast Guard approval. Navieros subsequently learned that the vessel was being detained in Puerto Rico. On April 18, while the ship was still in detention, Navieros filed a complaint in the federal district court in Puerto Rico, initiating this litigation. Initially, the action was  in  rem against the vessel to enforce  4. The violations of the International  Convention  for  the Safety of Life at Sea , 32 U.S.T. 47, T.I.A.S. No. 9700 (1974), listed in the Coast Guard citation include: intoxication of the master (Jeftimiades); inability of intoxicated master to produce the necessary documents and certificates to Coast Guard officers; non-compliance with minimum safe manning certificate; various problems with electrical wiring in the engine room; lighting in engine room not covered; watertight door in engine room could not be closed due to installation of cable through doorway; non-working aft port fire hose; unreadable fire control plan; absence of dangerous cargo manifest for dangerous cargo on board; and carbon dioxide alarm system disconnected and activation pull cable not labeled. -6- 6 an alleged maritime lien based on the breach of a time charter agreement. Later that same day, April 18, the district court, in an ex parte proceeding, ordered the arrest of the vessel pursuant to Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims to the Federal Rules of Civil Procedure. Rule C allows the holder of a maritime lien to proceed in rem against the vessel that is the subject of the lien. In its order, the court stated that Navieros had made a prima facie showing of a maritime lien against the vessel. Vasilia, as claimant of the in rem defendant M/V VASILIA EXPRESS, filed a motion for a post-arrest hearing on April 23. Vasilia claimed that the arrest of the vessel was improper because Navieros had no maritime lien. The only argument advanced by Vasilia at this point against the existence of a lien was that the charter party between Navieros and Royal United had not been fixed. A charterer's maritime lien, a right derived from a contract, will not arise in the absence of a fixed charter party, that is, in the absence of an enforceable contract. In response to Vasilia's motion, Navieros amended its complaint on April 24 and moved alternatively for attachment of  5. Later, Vasilia would argue that there was no lien because the contract was still executory at the time of the breach; maritime liens do not arise from the breach of an executory charter party. -7- 7 the vessel under Supplemental Rule B. Navieros also added Royal United as an  in  personam defendant. One of the pertinent differences between Rules C and B is that the latter does not require the existence of a maritime lien. Rule B allows an admiralty plaintiff to acquire quasi in rem jurisdiction over a defendant by attaching his property in the district; this approach is available only if the defendant "shall not be found within the district." As required by Rule B, Navieros submitted an affidavit stating that, to the best of its knowledge, after a diligent search, defendant Royal United could not be found within the district. The court ordered attachment of the vessel pursuant to Rule B on April 29. In its May 1, 1996 answer to Navieros's amended complaint, Vasilia reiterated that Navieros had no maritime lien because there was no fixed charter party. Vasilia also filed a counterclaim against Navieros for wrongful arrest, and asserted that if the court should find that there was a fixed charter party, then the dispute "would be subject to compulsory arbitration." Vasilia did not move to compel arbitration at this time. The next day, April 30, Vasilia filed a "request for amended process of arrest" in which it asserted that the Rule B attachment was wrongly ordered by the court because Vasilia had designated an agent in the district upon whom process could be served on behalf of Vasilia. Navieros then amended its -8- 8 complaint again to name Vasilia as  in  personam defendant along with Royal United. Trial ultimately proceeded on this second amended complaint. That same day, the court held a hearing and ordered the case expedited. The court accelerated discovery and set a May 23 trial date. The court later explained, in its June 7 memorandum opinion, that this rushed schedule was necessary because the vessel had "a fair market value of $500,000," it "was accruing significant expenditures incidental to the arrest," and there were "liens or potential liens exceeding its fair market value." The court also denied Vasilia's motions to vacate the Rule C arrest of the vessel and the Rule B attachment of it. The court stated that the arrest could be lifted by the posting of a $200,000 bond. No bond was posted. On May 8, Vasilia filed a "second motion to vacate arrest and attachment and for second post-arrest hearing." Vasilia now claimed that "there are new reasons" showing that the Rule C arrest was illegal. Vasilia argued that Navieros had no maritime lien because the vessel had not been delivered  6. On the first day of trial, the court again expressed its concern with the problems that would be caused by delay: "It's a vessel of marginal value in a marginal trade with charters and owners of marginal economic solvency and all that we're going to create [by transferring the case to arbitration] is a bigger problem for everybody here." 7. This motion and most subsequent submissions were filed by Vasilia alone, not by Royal United or the vessel. Hence, we often describe the collective defendants as "Vasilia." -9- 9 to Navieros, the charter party was still executory, and a maritime lien will not arise from the breach of an executory charter party. Vasilia cited for the first time Navieros's oft-repeated assertion in its pleadings that the vessel had not been delivered as required by the charter party. Both in personam defendants then waived the requirement that they be served with process and waived any objections to lack of personal jurisdiction. The court summarily denied Vasilia's motion on May 20, three days before trial commenced. On May 13, Comet and Transcaribbean Maritime Corp. ("Transcaribbean") filed motions to intervene as plaintiffs in the lawsuit. Comet is the second charterer; like Navieros, it pleaded a breach of contract claim. Transcaribbean is a San Juan-based ship's agent and stevedoring contractor which paid, on behalf of the vessel, harbor and port dues, pilot fees, and other expenses incidental to the ship's arrival and its subsequent detention in the Port of San Juan. On May 20, the court allowed both claimants to intervene. On May 22, on the eve of trial, Captain Jeftimiades filed a motion to intervene as plaintiff, asserting a maritime lien for unpaid seaman's wages. On May 23, the day the trial started, Gulf Coast Bank & Trust Co. ("Gulf Coast"), the holder of a first preferred mortgage on the vessel, filed a motion to intervene as plaintiff in order to request foreclosure. -10- 10 At the start of trial, the court ruled from the bench on the two motions to intervene. After establishing that neither Captain Jeftimiades nor his counsel were present in the courtroom, the judge ascertained from Navieros's counsel that Jeftimiades's counsel was aware that the trial was starting. The court then denied Jeftimiades's motion to intervene, stating: Well, the captain is not here. His lawyer is not here. Everybody is aware of the fact that this case was being tried or there was no reason not to know. Therefore, at this point in time I am denying for obvious lack of interest, they are not here, the motion for permission to intervene . . . . Gulf Coast's motion to intervene was granted. On this first day of trial, the court also ruled from the bench on Vasilia's motion to compel arbitration, filed the day before. Vasilia's motion relied on an arbitration clause in the charter party between Navieros and Royal United (and on a similar clause in the charter party with Comet). The motion came two days after Vasilia's pre-trial concession regarding the existence of a fixed charter with Navieros, a point Vasilia had been contesting until then. The court characterized this motion as among the "strongest" of the many pre-trial motions, but nevertheless denied it. The court stated that Vasilia had conducted itself thus far in the litigation in a manner inconsistent with a desire to enforce a contractual arbitration clause, and that it -11- 11 had "by its actions moved away from its right to arbitrate." Sending the case to arbitration, said the judge, would also, by causing further delay, increase the costs attendant to the continuing arrest of the vessel, and "create a bigger problem for everybody here." Because Vasilia admitted the existence and breach of a charter party with Navieros, trial proceeded on the question of damages alone. Vasilia argued that Navieros had no right to arrest the vessel under Rule C or to attach it under Rule B. Moreover, Navieros's resort to these procedures, Vasilia said in its counterclaim, had caused Vasilia to breach its contract with Comet and to incur other liabilities. Relying on the venerable executory contract doctrine, Vasilia argued that the Rule C arrest was improper because the vessel had not yet been delivered to Navieros at the time of the breach, and the charter party was still executory. Consequently, argued Vasilia, Navieros had no maritime lien and its resort to Rule C was invalid. Rule B attachment was also invalid, argued Vasilia, because this measure may only be invoked where the  8. Had Vasilia filed the motion to compel arbitration earlier in the pleadings, stated the court, "it would have been very difficult not to grant it." Additionally, the court indicated that, despite its belief that Vasilia had waived the right to arbitration, it might have granted the motion if Vasilia, while arguing the motion at trial, had expressed a willingness to post a $200,000 bond to release the vessel from arrest, thus hastening a conclusion to the expensive arrest. Vasilia's counsel responded, however, that his client could not post such a bond. -12- 12 defendant cannot be found within the district, and Vasilia had appointed an agent within the district for service of process on its behalf. The trial concluded on May 29, and the court issued its written memorandum and order on June 7. The court upheld both the Rule C arrest and the Rule B attachment. Rejecting Vasilia's Rule C argument, the court held that the vessel was effectively delivered to Navieros prior to the breach when Coleman boarded the vessel in Miami. The court stated: Although the vessel was to be technically delivered at the pilot station in Port Everglades, a location less than thirty nautical miles away, due to the proximity of the locations, the master and Mr. Psarellis accepted Kenneth Coleman's instructions to proceed further to Port Everglades and, with a pilot, to berth at Pier 19 in Port Everglades for loading. The vessel was, for all purposes, delivered to the charterer when Mr. Psarellis and the ship's master accepted Mr. Coleman's verbal instructions to proceed under the charter party agreement to Pier 19 at Port Everglades for loading. The court also upheld the Rule B attachment, rejecting Vasilia's argument that the attachment was improper because Vasilia had appointed an agent for service of process within the district. The court emphasized that Vasilia, a Liberian corporation, had had no corporate presence whatsoever in the district. The court stated that the eleventh hour appointment by Vasilia of counsel as local agent for service of process was -13- 13 a "strategic appointment directed at defeating the necessity of the rule" and could not be used to elude attachment. The court entered judgment against the vessel and the two in personam defendants: for Navieros in the amount of $182,952; for Comet in the amount of $100,312.13; for Transcaribbean in the amount of $24,777.26; and for Gulf Coast in the amount of $285,428.91. The total of the judgments against Vasilia amounted to $593,470.30. The court ordered that the vessel be sold by the United States Marshal at auction to satisfy these judgments. The court ruled that Gulf Coast had complied with the requirements of the Ship Mortgage Act, 46 U.S.C. S 30101 et seq., and had successfully shown that it had a preferred mortgage. The court, however, did not rank the four judgment winners. Nor did the court know, at the time the judgments were handed down, how much money would be available from the eventual sale of the vessel to satisfy the judgments. Several more would-be plaintiffs moved to intervene as a matter of right under Fed. R. Civ. P. 24(a) after the decision was handed down; these motions were denied. We discuss only those parties that appeal. The first of these post-judgment movants was Motor-Services Hugo Stamp, Inc.  9. We note that Gulf Coast's compliance with the provisions of the Ship Mortgage Act was the subject of considerable dispute in the district court. That question, however, is not before us. -14- 14 ("Motor-Services"), a Florida-based ship repair and supply company which sought to intervene on June 7, the day judgment issued. Motor-Services asserted a maritime lien in the amount of $76,460.55 for unpaid receivables due for work done on the M/V VASILIA EXPRESS and materials supplied to it between February 28 and March 29, 1996. The second post-judgment movant was Coastal Ship Repair, Inc. ("Coastal"), a Louisiana corporation which sought intervention on June 11. Coastal, too, asserted a maritime lien for moneys due for work performed and materials supplied the vessel, from May 2, 1995, through July 1, 1995. Coastal asserted a lien in the amount of $144,800. The court denied these two late motions on July 3 by separate written orders. The public auction was held July 2, but the required minimum bid of $400,000 was not achieved. A second auction was held on July 23 with a lower minimum of $300,000. Gulf Coast, the first preferred mortgage holder, bought the ship for $300,000. After confirmation of the sale, Jeftimiades, Coastal, and Motor-Services moved to stay disbursement of the proceeds until final resolution of these appeals. This motion was granted, and the proceeds of the sale, less certain administrative costs and fees, remain in an escrow account pending resolution of the appeal. II. Vasilia appeals on four grounds: (1) that the arrest -15- 15 and attachment were invalid; (2) that the motion to compel arbitration was wrongly denied; (3) that the court awarded both charterers, Navieros and Comet, excessive damages; and (3) that the court improperly pierced Vasilia's corporate veil. We resolve Vasilia's claims without the benefit of briefs from Navieros or any of the other plaintiffs in whose favor judgment was entered. A. Arrest and Attachment Vasilia admitted before trial that it was in breach of the charter party with Navieros. The main issue on appeal is whether Navieros was entitled to take the measures it took prior to trial regarding the vessel. Vasilia's position remains that (1) Navieros had no maritime lien and thus no right to arrest and (2) Vasilia had appointed an agent within the district for service of process on its behalf and so attachment was improper. Vasilia apparently infers that Navieros is responsible for the chain of events set in motion by the subsequent unavailability of the vessel: i.e., the breach of the Comet charter; Gulf Coast's decision to bring its foreclosure action; and the need for Transcaribbean to incur the custodial costs associated with the arrest of the vessel.  10. Navieros, the original plaintiff in this action, chose not to participate in this appeal. Navieros did not file a brief and did not appear at oral argument. Presumably, Navieros concluded that further participation in this litigation would be fruitless given the $285,000 judgment awarded Gulf Coast on its preferred mortgage lien. -16- 16 Vasilia's position appears to be that Navieros should have brought an in personam suit against Vasilia for breach of contract, rather than moving against the vessel under Rules C and B, and that this would not have resulted in the same domino effect. Navieros first invoked Rule C, seeking the arrest of the vessel on the basis of an asserted maritime lien. After Vasilia challenged the existence of a maritime lien, Navieros moved alternatively for Rule B attachment. The two strategies, though similar in effect, are based on entirely different theories. An in rem action [under Rule C] differs from maritime attachment [under Rule B] in that an in rem action is brought against the vessel itself as defendant. By contrast, a vessel is attached only as an auxiliary to an in personam claim because the vessel is property belonging to the defendant. 2 Schoenbaum, supra, S 21-3, at 478-79. The district court ordered both Rule C arrest and Rule B attachment of the vessel, and ruled both procedures proper in its written opinion. Vasilia challenges both rulings on appeal. Either procedure standing alone would have been sufficient to enable Navieros to  11. The two rules may be invoked simultaneously. See, e.g. , Amstar Corp. v.  S/S Alexandros T. , 664 F.2d 904, 906 (4th Cir. 1981); 2 Schoenbaum, supra, S 21-2, at 469 n.2, 470. -17- 17 ensure the continued presence of the vessel in Puerto Rico while the litigation proceeded. 1. Arrest The Rule C question is a close one, and it takes us into waters uncharted by this circuit. In order to invoke Rule C to arrest a vessel, a plaintiff must have a valid maritime lien against the defendant's vessel. See Bunn v. Global Marine, Inc. , 428 F.2d 40, 48 n.10 (5th Cir. 1970) ("a maritime lien is the foundation of a proceeding  in  rem");  Rainbow Line, Inc. v. M/V  Tequila, 480 F.2d 1024, 1028 (2d Cir. 1973) (" in rem jurisdiction in the admiralty exists only to enforce a maritime lien"); 2 Schoenbaum, supra, S 21-3, at 478-79. We affirm the district court holding that Navieros had a maritime lien. The Rule C arrest was thus valid. Under the executory contract doctrine, charterers have no maritime lien until performance of the charter contract  12. It is unclear from the record whether (and for how long) the United States Coast Guard detention of the vessel in Puerto Rico, effected on April 14, would have also detained the vessel. This could be an important matter because Vasilia's counterclaim -- based on the claim that Navieros wrongfully deprived it of the use of its vessel -- would be entirely moot if we could determine with any certainty that the Coast Guard detention would have continued at least through June 7, the date judgment was entered for Navieros. If this were the case, any wrongful arrest or wrongful attachment would likely be harmless error, cured by the judgment. The district court opinion, issued on June 7, does state "[a]s of this date, the vessel is still detained at the port of San Juan, Puerto Rico, by virtue of the U.S. Coast Guard prohibition for the cited safety violations." But there is no evidence in the record before us on this point. In the absence of such evidence, we address Vasilia's arguments on their merits. -18- 18 begins. Krauss  Bros.  Lumber  Co. v. Dimon  S.S.  Corp.  (The Pacific Cedar), 290 U.S. 117, 121 (1933); Osaka Shosen Kaisha v. Pacific Export Lumber Co. (The Saigon Maru), 260 U.S. 490, 495 (1923). "Liability arises in the admiralty as elsewhere from breach of any valid contract, but until the parties have entered in performance remedy for the breach is in personam only; the added advantages of lien status are reserved to claimants under executed contracts." Gilmore & Black, The Law of Admiralty S 9-22, at 635 (2d ed. 1975); see also Bunn, 428 F.2d at 48 n.10 ("The rule in admiralty is well settled that no lien attaches for the breach of an executory contract. . . . [U]ntil the parties have entered into performance, the remedy in admiralty for the breach is in personam only."); Rainbow Line, 480 F.2d at 1027 n.6; The  Oceano, 148 F. 131, 133 (S.D.N.Y. 1906); Rule C(1) (setting forth when an action  in  rem may be brought). Here the goods to be shipped were never actually loaded on the vessel. The vessel never got to the dockside for loading. There is no evidence that the goods to be shipped were ever in the custody or control of the vessel master. Ordinarily, those facts would most likely end any claim of maritime lien. See Gilmore & Black, supra, S 9-22, at 636. The great majority of cases addressing the executory contract doctrine, however, have concerned contracts of -19- 19 affreightment evidenced by bills of lading or voyage charters. E.A.S.T.,  Inc. v. M/V  Alaia, 673 F. Supp. 796, 802 (E.D. La. 1987), aff'd, 876 F.2d 1168 (5th Cir. 1989). This case involves a time charter agreement. The district court relied heavily on the reasoning in E.A.S.T., where the court distinguished between voyage charters and time charters as to when the contract is no longer executory (and, consequently, as to when a maritime lien arises). With voyage charters, whether control over the cargo shifted to the vessel will most likely determine whether a maritime lien exists. E.A.S.T., 673 F. Supp. at 802-04. With time charters, however, a maritime lien may arise even before control of the cargo shifts to the vessel. Id.; see also Rainbow  Line, 480 F.2d at 1027 n.6 (noting that cargo need not be loaded for time charter to lose executory status). This distinction is sensible because under a time charter the shipowner agrees to put his vessel, master, and crew to the service of the time charterer for a named period. E.A.S.T., 673 F. Supp. at 802. The time charterer must begin his performance "well before cargo is, if ever, loaded on the vessel -- by paying hire, appointing and funding a port agent,  13. A "voyage charter" is a contract of affreightment under which the carrier, who either owns or manages a ship, agrees to transport a certain amount of the charterer's cargo ("freight") from one port to another. The charterer pays for the shipment of freight by the voyage. 2 Schoenbaum,  supra, S 11-4, at 175- 76. -20- 20 and arranging and paying for pilotage, tug assistance and line handlers and all else necessary to berth the vessel in order to load cargo." Id. at 803. Here, the time charter form agreement specified that: Vessel to be placed at the disposal of the Charterers, at Delivery Arrival Pilot Station Port Everglades Any Time, Day, Night . . . . The president of the plaintiff charterer boarded the vessel 30 miles from Port Everglades, and changed the instructions as to the destination (berthing at Pier 19 at Port Everglades instead of at the pilot station). The vessel proceeded until it experienced mechanical problems and it stopped for repairs short of Port Everglades. While it was undergoing repairs, the charterer boarded the vessel four or five times, ordered fuel for the vessel, confirmed its reservation of a berth space, and issued a check to pay U.S. Customs fees. Under these circumstances, we cannot say that the experienced trial judge erred in concluding that there was sufficient delivery of the vessel to the charterer, Navieros, and sufficient performance of the contract that the charter was no longer "executory." Accordingly, there was a maritime lien and the Rule C arrest was proper. 2. Attachment  14. We reach this conclusion, as the district judge also did, notwithstanding Navieros's claim in its pleadings that the vessel had not been delivered to it. -21- 21 We also affirm the Rule B attachment because Vasilia was not "within the district" at the time attachment was sought and granted. On April 30 Vasilia submitted to the court a copy of a letter saying that Vasilia had appointed an agent for service in the district. The letter, dated April 26, 1996, states in its entirety: This is to confirm that owners are authorizing CALVESBERT and BROWN as attorneys to accept service of process on behalf of VASILIA INC. who is the owner of M/V VASILIA EXPRESS which was named in a suit filed by Navieros Interamericanos in Federal District Court in Puerto Rico. There is no addressee designated on the face of the letter. There is evidence at the top of the page that the letter had been sent via fax to the recipient on April 29. Rule B allows the attachment of a vessel or other tangible property under certain circumstances to gain  quasi  in rem jurisdiction over a defendant. A Rule B attachment may only proceed when the defendant is not "found within the district." The case law makes it clear that: whether or not [a foreign defendant] can be found within the district presents a two-pronged inquiry: first whether it can be found within the district in terms of jurisdiction, and second, if so, whether it can be found for service of process. The first inquiry is directed to whether or not the respondent is present within the district by reason of activities on its behalf by authorized agents so as to subject it to [the district court's] jurisdiction in in -22- 22 personam proceedings. If not, then the respondent cannot be found within the district and this ground alone would be sufficient to support the attachment. Even if the foreign respondent be found within the district in a jurisdictional sense, its property is not immunized from attachment. The second question . . . then presents itself. Could the respondent be found within the district with due diligence for service in the libel proceeding? United  States v. Cia.  Naviera  Continental  S.A., 178 F. Supp. 561, 563-64 (S.D.N.Y. 1959) (footnote omitted). If the respondent can be found within the district, then attachment may not proceed. As to the first inquiry, it is undisputed that by purposefully sending its vessel into Puerto Rico, Vasilia subjected itself to personal jurisdiction in that district. As to the second inquiry, Vasilia argues that the attachment was wrongful because it had appointed an agent for service of process in the district. But the fact is Vasilia's purported appointment of the agent came, at the earliest, on April 26, two days after Navieros moved for an order of attachment (and after Navieros filed an affidavit, as required by Supplemental Rule B, saying Navieros had been unable to find the defendant within the district).   15. Navieros's affidavit says that Navieros could not find Royal  United within the district. No mention was made of Vasilia, the actual owner of the vessel. However, Navieros is not to blame for this. Royal United held itself out as the owner of the vessel in the charter party agreement with Navieros. The two entities are obviously closely related. -23- 23 The district court was not unjustified in stating that Vasilia's argument would eviscerate the time-honored process of maritime attachment. If we were to accept Vasilia's position, a defendant who was otherwise safely outside the service power of the district could effectively avoid Rule B attachment by waiting until after the plaintiff filed a Rule B motion to designate an agent for service. Nor was Vasilia, simply by virtue of its subsequent appearance in this action, entitled to dissolution of the attachment. Swift v. Compania  Colombiana, 339 U.S. 684, 693 (1950). But Vasilia was not without options. Prior to trial, Vasilia had the opportunity, pursuant to Supplemental Rule  Whatever prejudice Vasilia may have suffered by virtue of the fact that Navieros did not submit an affidavit stating that Vasilia could not be found within the district properly falls on Vasilia. 16. Moreover, the evidence defendant relies on here is simply a letter from defendant to an unstated addressee purporting to "confirm" that Calvesbert & Brown has been authorized to accept service of process on Vasilia's behalf. This letter cannot be enough to establish presence in the district within the meaning of Rule B. The letter was not published and presumably neither Navieros nor the court knew (nor could have known) about the arrangement between Vasilia and its lawyers until after Vasilia submitted a copy of the letter to the court. 17. Rule B, the modern codification of the ancient right of foreign attachment in admiralty, see Swift v. Compania Colombiana, 339 U.S. 684, 693 (1950), has two recognized purposes: (1) to assure defendant's appearance and (2) to assure satisfaction in case the suit is successful. Id. at 693-95;  LaBanca v.  Ostermunchner, 664 F.2d 65, 68 n.4 (5th Cir. 1981);  Seawind Compania, S.A. v.  Crescent Line, Inc. , 320 F.2d 580, 581-82 (2d Cir. 1963). Post-attachment appearance may moot the first purpose but it does not address the second purpose. -24- 24 E(5)(a), to post a bond of $200,000 in order to obtain the release of the vessel. Vasilia declined to exercise this right. B. Arbitration The district court found that Vasilia had waived its contractual right to arbitration by participating in the litigation for over a month before filing a motion, one day before the start of trial, to compel arbitration. Vasilia protests that this ruling was error, but its arguments are not persuasive. Vasilia complains that it could not have moved to compel arbitration earlier because it was not until two days before the start of trial that Vasilia admitted the existence of the charter party under which the right to arbitration was established. Indeed, Vasilia did assert, at various stages of the pleadings, that, if the court should determine the existence of a charter party, then the case should be removed to arbitration. Had it moved for arbitration earlier, Vasilia says, this step could have been interpreted as a concession that the charter party was fixed, because the right to arbitration comes from a clause in the charter party. By not moving until the day before trial, on the other hand, Vasilia was found to have waived the right. Vasilia says the district court's position presented Vasilia with a Hobson's choice between admission and waiver. Litigation frequently puts -25- 25 parties to hard choices, particularly as to which of seemingly inconsistent theories to pursue. Vasilia is responsible for the consequences of its choices. Review of a district court's determination of waiver of the right to arbitration is plenary. Menorah  Ins.  Co. v. INX Reinsurance Corp. , 72 F.3d 218 (1st Cir. 1995);  Commercial Union  Ins.  Co. v. Gilbane  Bldg.  Co., 992 F.2d 386, 390 (1st Cir. 1993). The party opposing the motion to compel arbitration -- that is, the party urging a waiver -- must show prejudice. Sevinor v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 807 F.2d 16, 19 (1st Cir. 1986). There was prejudice here. The delay was not long in absolute terms; it was only one month. But in the unusual context of this litigation this delay was both long and prejudicial. The delay lasted from the filing of the complaint to the eve of trial. In the interim, in this expedited litigation, the parties scrambled to prepare their cases for trial, incurring expenses that would not have been occasioned by preparing for an arbitration. That is enough to show prejudice. Menorah, 72 F.3d at 212. The desirability of enforcing arbitration clauses is much recognized. Mitsubishi  Motors  Corp. v. Soler  Chrysler- Plymouth Inc. , 473 U.S. 614, 633 (1985). Arbitration may be "a mutually optimal method and forum for dispute resolution [which] serves the interests of efficiency and economy." -26- 26 Menorah, 72 F.3d at 223. But we have also recognized that the very rationale for arbitration may be undercut if a party is permitted to pursue a claim through the courts and then later claim a right to arbitration. Id. Accordingly, we have repeatedly held that a party may, by engaging in litigation, implicitly waive its contractual right to arbitrate. Id.; Caribbean Ins. Servs., Inc. v.  American Bankers Life Assurance Co., 715 F.2d 17, 19 (1st Cir. 1983); Jones  Motor  Co. v. Chauffeurs  Local  Union  No.  633, 671 F.2d 38, 43 (1st Cir. 1982);  Gutor Int'l AG v.  Raymond Packer Co. , 493 F.2d 938, 945 (1st Cir. 1974). Vasilia complains of self-inflicted wounds. Vasilia denied it had a valid charter party with Navieros up until the eve of trial. It then switched positions, admitted the validity of the charter party, and sought to invoke arbitration under the charter party. We agree with the district court that this conduct amounted to a waiver. C. Corporate Status of Vessel Owners The Vasilia parties object to certain references in the district court's opinion which, they believe, imply that the court had pierced the corporate veils of Vasilia and Royal United, without conducting the proper legal analysis. They ask us to strike from the district court opinion these statements (and strike from the pleadings similar references made by plaintiffs). The argument is misplaced. It is a basic -27- 27 principle of appellate jurisdiction that we review judgments, not the editorial commentary in opinions. To the extent that appellants mean to argue that the district court's imputation of liability for the Navieros and Comet judgments to the in personam defendants -- Vasilia and Royal United -- was erroneous, they also fail. There are two distinct issues here: (1) whether Vasilia, the owner of the vessel, can be held liable for any damages apart from the proceeds obtained from the sale of the vessel, and (2) whether Royal United, the shipping agent and a nominally separate corporation, can be held so liable. We agree with the district court that the answer to both questions is yes. The normal rule in admiralty actions  in  rem, such as this one was initially, is that judgment creditors, absent service of process on the vessel owner under Fed. R. Civ. P. 4, are only entitled to enforce their liens against the vessel itself. See Orbis  Marine  Enters.,  Inc. v. TEC  Marine  Lines, Ltd., 692 F. Supp. 280, 284 (S.D.N.Y. 1988);  East Asiatic Co., Ltd. v.  Indomar Ltd. , 422 F. Supp. 1335, 1341 (S.D.N.Y. 1976); 2 Schoenbaum,  supra, S 21-2, at 469;  cf.  Cooper v.  Reynolds, 77 U.S. 308, 318-19 (1870) (same principle in non-admiralty action in rem). The owners of the vessels against which actions in  18. The district court's finding of liability against Vasilia and Royal United is limited to the judgments of the two charterers, Navieros and Comet. The judgments of Gulf Coast and Transcaribbean run only against the in rem defendant the M/V VASILIA EXPRESS. -28- 28 rem are brought are not, in such cases, personally liable for judgments in excess of the value of the vessel, if any. But this is not the normal case. Here, both in personam defendants, Vasilia and Royal United, waived the requirement of service of process and waived all defenses related to personal jurisdiction. They both appeared voluntarily as in personam defendants. We recognize, of course, that this was done for strategic reasons. The waivers and appearances came as part of defendants' ultimately unsuccessful campaign against Rule B attachment of the vessel by Navieros. Nevertheless, Vasilia and Royal United must live with the consequences of their choices. The waivers and appearances allowed the action to blossom into the full in personam case against the two defendants for breach of the charter party that Navieros had contemplated in its pleadings. Cf.  Atkins v.  The Disintegrating Co., 85 U.S. 272, 298 (1873). We see no error in the district court's finding of liability against both defendants. D. Damages Vasilia complains that both Navieros and Comet were awarded excessive damages. The propriety of the amount of  19. We are dubious about the practical significance of this matter. It is clear that there will be nothing left of the proceeds for Vasilia. The parties who may have the greatest interest in reducing the share awarded Comet or Navieros -- namely, the competing judgment winners -- have not complained. -29- 29 damages awarded is an issue of fact, which we review for clear error. Reilly v. United  States, 863 F.2d 149, 166 (1st Cir. 1988). 1. Navieros The breach of the Navieros time charter occurred when the vessel was diverted to the use of Comet, after performance of the Navieros contract commenced but before Navieros's cargo was loaded. Without noting the distinction, defendants assert that the measure of damages should be that which is used in cases where the owner breached the charter party by repudiating it  before performance began . The general rule for recovery in that situation was stated long ago by Judge Learned Hand: "the withdrawal of the ship entitled [the charterer] prima facie to damages measured by the difference between the hire reserved in the charter and the hire necessary to secure such another bottom." The  Ada, 239 F. 363, 364 (S.D.N.Y. 1916), rev'd  on other grounds, 250 F. 194 (2d Cir. 1918); see also Sanders v. Munson, 74 F. 649, 651 (2d Cir. 1896); 2 Schoenbaum, supra, S 11-17, at 204-05 ("The charterer's damages for cancellation are equal to the difference between the contract hire in the  And, indeed, neither Navieros nor Comet has appeared to defend the judgments in their favor. However, in light of the affirmance of the district court's liability finding as to the two  in  personam defendants, it is possible that Navieros and/or Comet will seek to enforce their judgments against the in personam defendants. And so, we must visit this matter. We also note that, as discussed later, the denial of intervention to Motor-Services and Coastal was in error, and accordingly those two parties may have an interest in these damages awards. -30- 30 broken charter and the hire necessary to secure another vessel."). It seems reasonable to apply this general rule here, provided the victim of the breach is also allowed to recover out-of-pocket expenses incidental to preparing for the arrival of the ship for loading. Inherent in that rule, of course, is a duty of mitigation; the victim of the breach must make reasonable efforts to locate a substitute vessel. See Glidden  Co. v. Hellenic  Lines,  Ltd., 315 F.2d 162, 164 (2d Cir. 1963); The Ada, 239 F. at 364;  Sanders, 74 F. at 651; 2 Schoenbaum,  supra, S 11-17, at 204-05. If the charterer is unable to locate a suitable substitute vessel, then the proper measure of damages for the breach is its lost profits. See  Polar Steamship Corp. v.  Inland Overseas Steamship Corp. , 136 F.2d 835, 842 (4th Cir. 1943); The  Ada, 239 F. at 364. Here, the trial court found that Navieros was unable to locate an adequate substitute. Defendants argue that Navieros in fact found a suitable substitute, but did not use it. We review findings of fact for clear error. Roche v.  Royal Bank of Canada , 109 F.3d 820, 827 (1st Cir. 1997). William Coleman's deposition testimony at trial and Kenneth Coleman's trial testimony were the only evidence offered by any of the parties on the question of mitigation. According to William Coleman's uncontroverted testimony, Navieros conducted an intensive but fruitless search for a -31- 31 replacement vessel. Cf.  Polar Steamship Corp. , 136 F.2d at 842 ("The evidence is that efforts were made to obtain [another vessel] but without success."). It is true that Navieros learned about an available vessel and did consider using it in place of the M/V VASILIA EXPRESS, but decided in the end that this vessel was too slow. Such a decision was within Navieros's rights. See  Sanders, 74 F. at 652 (charterer "under no obligation to accept a slower and smaller vessel than the [originally chartered vessel] had been represented to be"). The district court was not obliged to credit William Coleman's testimony, but it is certainly not clear error for it to have done so. Even using the rule advocated by defendants, therefore, the proper measure of damages for the breach here  20. Defendants claim that this alternate vessel would have been a suitable replacement, as its speed -- which William Coleman stated to be 8 to 9 knots per hour -- was roughly the same as the speed of the M/V VASILIA EXPRESS. Coleman's deposition, taken in context, reveals that his concern was with the speed in relation to other costs. The thing that made her unattractive was her speed, okay, related to her costs. . . . Her speed, with the size tug that they were talking about and the barge, she would be offering you eight to nine knots but the daily cost and the fuel consumption was such that her per diem cost was way high. We are persuaded that Navieros's choice not to use this alternate vessel was not a violation of its duty to mitigate.  -32- 32 was Navieros's lost profits. The court purported to apply such a measure, but defendants argue that it awarded Navieros "lost revenues" instead, a far more generous dollar amount. Indeed, the court's choice of words was at times confusing; for instance, it titled the table of damages calculations "Gross Loss of Revenue." We must look past the question of word choice and determine if the correct measure was applied. These are the components of damages awarded Navieros: (1) gross freight in the amount of $67,000, returned to shippers upon demand; (2) canceled bills of lading issued in Guatemala, representing $118,000 of freight charges for three voyages; (3) freight charges [of $71,175] on southbound cargo received in Port Everglades, eventually returned to shippers; (4) net loss of $3,377 over $26,000 worth of freight rerouted through another steamship line providing service to Guatemala. From this "Gross Loss" of $259,552, the court subtracted "charter hire expense" of $57,600 and "fuel expense" of  21. Profit is "the excess of returns over expenditure in a transaction." Webster's  Third  New  International  Dictionary 1811 (6th ed. 1993). 22. Revenue is, in this context, "the total income produced by a given source." Webster's Third New International Dictionary 1942. Revenues are greater than profit; a portion of one's revenues, in a successful venture, is profit. -33- 33 $19,000. The "Net Loss" was $182,952, and the court awarded damages in this amount. That the court subtracted charter hire and fuel expense from the sub-total seems to indicate that, despite its choice of words, the court did not see the award as one of lost "revenues" per se. However, a radically different conception of Navieros's lost profits is found in William Coleman's deposition. Coleman stated that Navieros expected to make $28,500 in profits from the shipping of cargo under the M/V VASILIA EXPRESS charter (this estimate included the exercise by Navieros of its option on a third round-trip). Kenneth Coleman also testified at trial that Navieros charters approximately 50 voyages per year and that Navieros's 1995 net profits were roughly $495,000. The average profit per voyage is thus just under $10,000. Given this, it is hard to understand how the loss of the three M/V VASILIA EXPRESS voyages caused $182,952 in lost profits. Because it is unclear on what basis the district court calculated lost profits, we vacate the damages award and remand the question of Navieros's damages to the district court for clarification. 2. Comet -34- 34 Defendants challenge six of the thirteen components of the $100,312.13 award to Comet. They claim (1) that Comet should not have been awarded the stevedoring fees ($4,500) and ship's agency fees ($4,999.26) incurred at the port of origin, Miami, because Comet would have incurred these expenses even if the charter had not been breached; (2) that the award of fuel costs for both the M/V VASILIA EXPRESS ($5,312) and the replacement vessel secured by Comet ($7,326) was duplicative; and (3) that the award of the entire cost of the substitute vessel ($15,000), along with the reimbursement of the M/V VASILIA EXPRESS charter hire ($39,450), was likewise duplicative. Defendants also argue that the district court "failed to account for the fact that cargo problems were part of the reason why the U.S. Coast Guard initially detained the M/V VASILIA EXPRESS in Puerto Rico, which, along with the arrest by Navieros, led to the vessel's inability to carry Comet's cargo." The final point borders on frivolous, in light of the numerous vessel-related and captain-related deficiencies cited  23. We need not be detained by the district court's statement that Comet's damages were "announced as a stipulation of the parties." If this were so, of course, defendants would have no leg to stand on. But there was no such stipulation. Defendants simply stipulated that they would not challenge the admission of certain documents Comet intended to use to prove its damages; they made clear their objections to the underlying merits of the damages claims. -35- 35 by the Coast Guard. See footnote 4  supra. But the first three claims have considerable merit. The damages award included reimbursement for the stevedoring costs associated with transferring the cargo from the M/V VASILIA EXPRESS to the replacement vessel. In light of this, the award of costs for the original loading of the M/V VASILIA EXPRESS was inappropriate. The award of the stevedoring costs at the port of origin ($4,500) is thus vacated. Comet did not make a claim for reimbursement for any shipping agency fee for the replacement vessel, so there was no double dipping there. But that is also why the fee paid by Comet at the port of origin ($4,999.26) is not recoverable: Comet apparently incurred no additional shipping agency costs as a result of the breach. That award too is vacated. There was excessive recovery for the fuel costs too. Comet should pay only for the fuel used by the M/V VASILIA EXPRESS on the initial Miami-San Juan run, which was completed before the breach, but not for the additional fuel, if any, that it deposited in that vessel's gas tanks in Miami in expectation of the continuation of the voyage to Venezuela. Comet is also entitled to differential money damages; that is, it should be reimbursed for that portion of the fuel purchased for the replacement vessel that was in excess of the expected cost of fuel for the M/V VASILIA EXPRESS, had the latter ship fulfilled its contractual obligations. These are calculations -36- 36 that are necessarily based on estimates and expectations. The record indicates that the replacement vessel consumed more fuel than the M/V VASILIA EXPRESS, but we are unable to glean precise details about this or about whether the M/V VASILIA EXPRESS was left with any Comet-purchased fuel when detained and arrested in the Port of San Juan, and if so, how much. We thus vacate the two fuel cost awards ($5,312 & $7,326) and remand to the district court for an amended award in light of this discussion. Comet was awarded excessive damages for charter hire too. Comet is entitled to differential damages. Where the substitute vessel costs less than the one originally chartered, the charterer is entitled to a refund of the price paid for the original, but it should pay for the substitute. If the replacement costs more, the charterer should get reimbursed for this difference in cost. It is difficult to imagine a situation where the charterer would be entitled to a refund of the original charter hire and an award of replacement costs. Here, Comet's replacement vessel ($15,000) cost less than the M/V VASILIA EXPRESS ($39,450). Comet therefore is entitled to a refund of the M/V VASILIA EXPRESS charter hire, but not to an award of costs for the hire of the replacement. The $15,000 award is thus vacated. III. We turn to the appeals of the various would-be -37- 37 claimants whose motions for intervention were denied, and who thus missed out on the chance to compete for a share of the proceeds. We review a district court's denial of a motion to intervene for abuse of discretion. Conservation Law Found. of New  England v. Mosbacher, 966 F.2d 39, 41 (1st Cir. 1992); International Paper v.  Town of Jay , 887 F.2d 338, 343 (1st Cir. 1989);  cf.  Banco Popular de Puerto Rico v.  Greenblatt, 964 F.2d 1227, 1230 n.3 (1st Cir. 1992). We analyze the district court's rulings against the backdrop of a purposefully accelerated litigation in which scarcely more than a month passed between the arrest of the vessel and the start of trial, with the memorandum and order admirably following trial by less than two weeks. We are also mindful of the fact that the standards for timeliness are less strict for Rule 24(a) motions to intervene (intervention as a matter of right) than for such motions under Rule 24(b) (permissive intervention), and that  24. Gulf Coast, the preferred mortgage holder who won judgment in the district court, appeared in this appeal to defend the district court's decisions to deny intervention. Gulf Coast obviously fears that the liens of the three would-be intervenors would prime its own lien, severely diminishing, if not eliminating entirely, its ultimate recovery in this action. See 46 U.S.C. S 31326(b)(2) (for certain foreign vessels, preferred mortgage lien subordinate to maritime lien for necessaries provided in the United States); id. S 31326(b)(1) (preferred mortgage lien subordinated to "preferred maritime liens");  id. S 31301(5) (lien for seaman's wages is "preferred maritime lien");  see  also 1 Schoenbaum,  supra, S 9.6, at 510.  -38- 38 all three appellants here invoked Rule 24(a). Banco Popular , 964 F.2d at 1227 n.2; Fiandaca v. Cunningham, 827 F.2d 825, 832-33 (1st Cir. 1987); Stallworth v. Monsanto  Co., 558 F.2d 257, 266 (5th Cir. 1977). We conclude that the district court properly exercised its discretion in denying Captain Jeftimiades's attempted intervention, but that it abused its discretion in denying the attempted interventions of Motor- Services and Coastal. A. Captain Jeftimiades Captain Jeftimiades, asserting a maritime lien for unpaid seaman's wages, moved to intervene a day before the start of trial. The district judge denied Jeftimiades's motion from the bench on the first day of trial after learning that neither the captain nor his attorney were present in the courtroom. Unlike the motions of Coastal and Motor-Services, the captain's motion was not denied on timeliness grounds; indeed, the judge indicated that he probably would have allowed intervention had the captain or his attorney been present at the start of trial. The judge carefully determined that the captain's attorney had been duly informed of the trial date before  25. Motor-Services, alone among the post-judgment movants, did not specify in its motion that it was seeking intervention as of right under Fed. R. Civ. P. 24(a), as opposed to permissive intervention under Fed. R. Civ. P. 24(b). But Motor-Services captioned the motion as one to intervene "as a matter of right," and so we give it the benefit of the doubt. -39- 39 announcing that he was denying the motion. Jeftimiades does not argue on appeal that his counsel had not been informed of the May 23 trial date; he simply states that counsel "erroneously thought the trial date was May 30th" and that he was in New Jersey on May 23 and could not have appeared. Jeftimiades argues that his counsel's associate was available to represent the captain and that the court should have requested that this associate appear on the captain's behalf. However, the judge was not told that counsel was out of the Commonwealth, and, while the judge certainly could have inquired further into the matter if he wished, he was not obliged to do so. Captain Jeftimiades also argues that, as a seaman, he is a ward of the court who is entitled to greater protection than the average intervenor. Courts have allowed seamen to avoid rules of common law which affect them particularly harshly because of their vocation. This is true where a rule of law has especially harsh results on a seaman because he is a seaman . For instance, in Socony-Vacuum Oil Company v.  Smith, 305 U.S. 424, 430-31 (1939), the leading case cited by Jeftimiades, the Supreme Court was faced with the question of whether a seaman who had used a dangerous appliance on board could have his claim barred by the doctrine of assumption of risk. The Court cautioned against the application of the doctrine in admiralty cases because seamen often have fewer -40- 40 alternatives than do land-based workers, and are often in less of a position to avoid dangerous situations.  Id. This case is easily distinguishable. Captain Jeftimiades's failure to appear at trial through counsel is not explained by any special disabilities attendant to his status as a sailor. Jeftimiades does not address the issue of whether there would be any prejudice to the existing plaintiffs if he were allowed now to intervene. Clearly, there would be prejudice in light of the Coast Guard citation, which described Jeftimiades as drunk at the time the vessel was detained. Vasilia or some of the claimants might have attempted at trial to prove that the captain forfeited his maritime lien for wages. Cf. Johnston v. M/V Dieu Si Bon, 1996 WL 866112 (W.D. Wa. 1996) (question of fact whether seaman forfeited lien for wages by deserting ship). Of course, no one made this argument at trial because the captain's attempted intervention was denied. Allowing Jeftimiades to intervene now would necessitate ordering new proceedings in which the parties could attempt to make this claim. We recognize that the prejudice to Jeftimiades is also severe, but he had the opportunity to make  26. His maritime lien is destroyed. It is a basic principle of admiralty law that execution of a maritime lien extinguishes all other liens on ship. See,  e.g., Tamblyn v. River  Bend Marine  Co., 837 F.2d 447, 448 (11th Cir. 1988) (per curiam); Point Landing, Inc. v.  Alabama Dry Dock & Shipbuilding Co. , 261 F.2d 861, 866 (5th Cir. 1958);  see  also Gilmore & Black,  supra, S 9-85, at 786-87. -41- 41 his case and did not take advantage of this chance. There was no abuse of discretion. B. Motor-Services Motor-Services moved to intervene on June 7, two weeks after the start of trial and the day on which the district court issued its memorandum and order. This motion was denied as untimely by written order on July 3. The court analyzed the motion under what it called "the First Circuit standard of  Banco Popular ." The timeliness standard applied in Banco Popular , 964 F.2d 1227, is derived from the Fifth Circuit opinion of Stallworth v. Monsanto  Company, 558 F.2d 257 (5th Cir. 1977). See Culbreath v. Dukakis, 630 F.2d 15, 20 (1st Cir. 1980) (adopting Stallworth test). The four factors are: the length of time the would- be intervenor knew or reasonably should have known that its interest was imperilled before it moved to intervene; the foreseeable prejudice to the existing parties if intervention is granted; the prejudice to the would-be intervenor if intervention is denied; and exceptional circumstances which may militate against or in favor of allowing late intervention. Banco Popular, 964 F.2d at 1231. The district court, weighing the matter by relying on the facts as alleged by Motor-Services in the motion, first determined that the credit term extended to Vasilia by Motor- Services expired on April 29, and that from that date until -42- 42 June 7 Motor-Services sought payment of the overdue receivables only by leaving telephone messages that went unreturned. The obvious implication of this finding (not stated by the court) is that Motor-Services sat on its rights when it should have been moving more decisively to protect its interest. Moving on to the second factor, the court then noted that the proposed intervention would prejudice the existing parties because: intervention on the day judgment was entered seeks to disturb the core of the judgment. The M/V VASILIA EXPRESS is appraised at $500,000 and the court has recognized plaintiffs by judgment in the aggregate amount of $593,469.39. The realities of the public sale market for vessels dictated that the public sale ordered would have an initial bidding price set at $400,000. Any sale proceeds will not be enough to cover the existing plaintiffs' rights. It is not fair to reopen the case for late-comers to gain an undue advantage under the circumstances. The court next found that no prejudice would inure to Motor- Services as a result of the denial of the motion because Motor- Services had waived its maritime lien by relying on the credit of Michael and Steven Psarellis, the vessel owners, and the credit of Royal United, the shipping agency. Finally, the court found that there were no exceptional circumstances militating in favor of intervention, as Motor-Services, in the court's view, would still be fully able to litigate the matter in personam against the vessel owners. -43- 43 The denial of the intervention was, in large part, based on erroneous legal conclusions reached by the district court. We believe the district court abused its discretion and that Motor-Services should have been allowed to intervene. The court found that the first factor weighed against Motor-Services because Motor-Services should have realized, as of April 29, that its interests were imperilled, but it failed to do anything about this until June 7, other than to try a few times (unsuccessfully) to reach the vessel owners by telephone. In the context of this expedited litigation, a period of inaction lasting nearly six weeks would be difficult to excuse. But the dates recited are not correct. In fact, it was not until  May 19 that the Vasilia account became overdue and Motor- Services actively sought to collect but was misled by the owners. Less than three weeks later, and within a few days of learning of the suit, Motor-Services had a motion before the court. In the days after May 19, the president of Motor- Services attempted to reach the vessel owners by telephone on three separate occasions. He was told that the owners would get back to him, but they never did. The secretary who answered the phone did not tell him about the arrest of the M/V VASILIA EXPRESS. Under these circumstances, we cannot say that  27. The invoice was issued on April 19 with a 30 day credit term. -44- 44 Motor-Services, which was actively trying to follow up on a recently overdue account, was guilty of inaction. It was not until June 3 that Motor-Services actually learned of the arrest of the vessel. Local counsel was retained the next day, and the motion to intervene was filed shortly thereafter, on June 6. Motor-Services had no way of knowing its maritime lien was imperilled prior to June 3; once it learned, it took prompt action to protect its interest. The first factor thus clearly militates in favor of allowing intervention. The district court, in discussing the second factor, concluded that the existing plaintiffs would be prejudiced by Motor-Services' intervention simply because the entry into the case of another party, with an arguably superior lien, would diminish the ultimate recovery available to those plaintiffs. This may well be true, but it is not enough to outweigh the other three factors, all of which favor intervention (particularly since the plaintiffs' rights to a specific share in the recovery had not yet become final and the sale proceeds had not yet been disbursed). On the third factor, the court found that there was no prejudice to Motor-Services because Motor-Services had waived its maritime lien. This was error. In inferring that Motor-Services had waived its maritime lien on the vessel, the  28. The president of Motor-Services was told of the arrest by a mechanic in Florida. He promptly called Navieros for confirmation. -45- 45 court relied on the existence of a promissory note given by Michael Psarellis to Motor-Services and on the fact that Motor- Services billed Royal United, the vessel's agent, rather than the vessel owners for much of the work done on the vessel. Motor-Services' maritime lien on the vessel arises by operation of federal law (the Maritime Lien Act). 46 U.S.C. S 31342. In order to acquire a lien on a vessel, a person providing necessaries to the vessel is "not required to allege or prove in the action that credit was given to the vessel." Id. S 31342(a)(3); see Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co. , 310 U.S. 268, 273 (1940). This is assumed to be the case unless proven otherwise; the party disputing the existence of the lien is required to show that "[t]he party entitled to the lien [took] affirmative actions that manifest[ed] a clear intention to forego the lien." Farrell Ocean Servs. v.  United States , 681 F.2d 91, 94 (1st Cir. 1982). The taking of additional security by the provider of necessaries from the vessel owner, without more, does not constitute such a step.  Dampskibsselskabet Dannebrog , 310 U.S. at 276-77;  Farrell Ocean Servs. , 681 F.2d at 93-94;  Crustacean Transp. Corp. v. Atalanta Trading Corp., 369 F.2d 656, 660-61 (5th Cir. 1966); Gilmore & Black,  supra, S 9-84, at 786. "The party attacking the lien has the burden of . . . showing that  29. Here, Motor-Services obtained a personal guarantee and promissory note from Michael Psarellis for $40,000. -46- 46 the party rendering the service [Motor-Services] relied  solely on personal credit." Farrell  Ocean  Servs., 681 F.2d at 93 (emphasis added). No such showing has been made here. The district court, in finding a waiver, also relied on the fact that Motor-Services billed Royal United, the M/V VASILIA's agent, rather than the owner of the vessel, for many of the services provided. However, "the submission of a bill to the owner's agent with whom the supplier has been dealing rather than to the owner and the vessel [does not] constitute waiver." Id. at 94;  see  also  Nacirema Operating Co. v.  S.S. Al Kulsum, 407 F. Supp. 1222, 1226 (S.D.N.Y. 1975) ("mere fact" that stevedore billed ship's agent for services provided vessel "not sufficient to indicate that there was an implied waiver of its right to a lien against the ship"). There was no waiver here. Because Motor-Services' lien was not waived by its conduct, it is the execution of the other liens on the vessel in this in rem proceeding which would strip Motor-Services of its lien, which would be forever extinguished. See  supra note 27. Clearly, there is ample prejudice to Motor-Services here. Finally, the district court stated that there were no special circumstances militating in favor of intervention because Motor-Services could still bring an action  in  personam against the vessel's owners. The record is silent as to whether the defendants are presently solvent or not, but Motor- -47- 47 Services is justifiably fearful that this right would be an empty one. At any rate, it is a right that pales in comparison to the right to exercise a lien against an identifiable sum of money. In light of this, and the fact that trial was expedited, we think there were special circumstances favoring intervention. Intervention should have been allowed. C. Coastal Our Coastal analysis, in substance, tracks the Motor- Services analysis. Coastal moved to intervene on June 11, 1996, asserting a maritime lien for repair work done on the vessel and supplies furnished the vessel the previous summer. The district court, by written opinion on July 3, denied the motion on untimeliness grounds. The court applied the four- factor test discussed above, and its reasoning was much the same as that used in the Motor-Services' denial. The only substantive difference in the court's analysis involved the third factor, where the court found that Coastal had explicitly waived its lien by agreeing to a payment plan with a clause obligating Coastal to forebear from going in rem against the vessel. On the first factor, in finding that Coastal did not move expeditiously to protect its interests, the court stressed the 22-day gap between the time Coastal first learned of the arrest and the time it sought intervention. We conclude that, -48- 48 under the unique circumstances of this case, Coastal acted reasonably promptly to protect its interests. Vasilia was required, under the terms of its credit agreement with Coastal, to make monthly payments of $17,500; payments were due on the 8th of each month, starting in April 1996. Vasilia made only partial payment in April, and failed to make the May payment. Coastal's president called Royal United on May 15, a week after the May 8 due date, to inquire about the non-payment. He was informed by Royal United that there was an ongoing dispute with Navieros and Comet regarding the charter of the vessel. While this is more information than Motor-Services was able to obtain when Vasilia failed to make its payment to Motor-Services at about the same time (May 19), Coastal, like Motor-Services, was not told of the arrest and the impending trial. It is true that Coastal heard something about an arrest through other channels during the week of May 20, but the information it obtained consisted only of "unconfirmed reports." Coastal moved expeditiously to confirm these reports. By early June, it had learned the details, and by  30. This credit agreement was negotiated and signed in January 1996, after Vasilia proved unable to meet the payment schedule originally agreed upon by the parties after Coastal's work on the vessel was completed in July 1995. 31. The record does not reveal how Coastal learned about the arrest. The district court fixed on May 20 because that is the date Coastal stated, in its motion to intervene, that it first heard about the arrest. -49- 49 June 11 had moved to intervene. That Motor-Services managed to get its motion in four days earlier is immaterial. The first factor weighs in Coastal's favor. As to the other factors, Coastal is in a similar position to Motor-Services and we will not repeat the analysis. Two of the remaining three factors clearly favor intervention, and intervention should have been allowed. IV. We affirm the judgment against the defendants, but vacate the awards of damages to Navieros and Comet and remand for proceedings consistent with this opinion. We affirm the denial of Captain Jeftimiades's motion to intervene. But we reverse the denial of Motor-Services' and Coastal's motions to intervene, and  remand to the district court to entertain their proof, calculate the damages due them, if any, rank the liens, and order disbursal of the funds to the various judgment creditors. Each party to bear its/his own costs.  32. We pause only to note that, contrary to the district court's findings, there was no explicit waiver of lien by Coastal. Coastal's agreement not to proceed against the vessel in rem was, by its terms, given "in consideration for [the renegotiated] payment schedule" on the Vasilia account. It was not a waiver of lien, but rather was an agreement by Coastal to forebear from doing something that Coastal was otherwise entitled to do. When Vasilia ceased making the required payments under the schedule, however, Coastal's temporary obligation to forebear from in rem action also ceased. -50- 50